The next argued case is number 17. Number 17, 2540, Oliver against the Secretary of Health and Human Services. Good morning, Your Honors. May it please the Court, I'm Clifford Shoemaker, representing petitioner in this case, Hetty Oliver. Your Honor, I've been doing vaccine injury litigation for over 40 years. And there's one thing that hundreds of experts have agreed with over that period of time. And that is that the reason why some children react adversely to a vaccination while the overwhelming majority do not has got to be due to genetic susceptibility and or the status of their immune system at the time of vaccination. Those are the only two reasons that we can have for explaining why some children react and most don't. But 40 years ago, the mechanism, the science for confirming genetic susceptibility didn't exist. And what's striking about this case is actually being able to genetically determine or verify or predict or whatever it is, the inclination, the susceptibility of this child. Yes, Your Honor, and it's exactly why this case is important, because medicine, as Your Honor has just pointed out, changes constantly. We were not allowed to have a hearing in this case, even though we asked for a hearing. This case is a case where the special master decided that this was equitable estoppel. She basically looked at other decisions that had been made in this area, pointed them out on a footnote and said- Wait, wait, wait. Show me where in the opinion, cite me to where in the opinion the chief special master applied equitable estoppel. She did not apply equitable estoppel. Didn't say those words. But what I'm saying is practically speaking, that is what happened. It was a matter of- Anywhere, any court, where a lower tribunal improperly applied equitable estoppel without mentioning it. Without mentioning the words? No, but you can- No, not the words. But you can- Yes, there are cases. I'm not sure what they are. But in this case, it's very clear. Come on, counsel. I don't know about the cases. I don't know about the cases. What I am clear about- But that's one of the cores of your case, the other being Dalbert. No, the core of our case is that the special master- You just said it was the core of your case. No, the core of our case, your honor- I can repeat back from- Okay. If I said that, I misspoke. The core of the case, your honor, is that the special master determined that this child's having an SCNA mutation was predestination. It meant that this child was going to have this reaction regardless. That the vaccines had nothing to do with it. There is no way that we can say that SCNA mutations are the sole factor unrelated to vaccinations. That cannot be said. And for simple reasons, if you look at the fact- Are you abandoning your Dalbert argument? No, I'm not abandoning anything in the petition in the briefs, your honor. But what I am is I'm trying to get to the heart of it. Because it looks to me, as I said, like your core arguments were your Estoppel argument, without citation of authority, and your Dalbert argument. And again, I'm going to ask you the same question I asked you about Estoppel. Where in the opinion does the chief special master actually apply Dalbert? The chief special master, I think, did talk about Dalbert. Mentioned it, but where did the chief special master apply a Dalbert analysis? I don't think she should and could have, because Judge Kaplan even pointed out that Dalbert is not even an issue, because you can't permit the testimony of the expert. If you've admitted the testimony, you've unmasked Dalbert. In that case, 17 through 33 of your blue grade seems to say the chief special master misapplied Dalbert. Now you're telling me, couldn't have. Well, she misapplied it with respect to the Alton prongs that Dr. Shafrir testified about. He talked about the second hit theory. Where did she, where, in her opinion, did she misapply it? Well, let me end this exchange, because I think that Dalbert does raise an extraordinarily fundamental issue in this case. With the march of science, what might have been considered inappropriate, unsupported under Dalbert, because of the difficulties of verifying the genetic predisposition is now history. This infant having experienced this reaction, one of the things that I think the special master mentioned was that even if the fever, the vaccination and the fever triggered this epileptic, the seizure response, with a genetic mutation that now can be checked and verified and even a few years ago wasn't available, that ends it, because the child had this problem and it was bound to come out. And this is a very, I think, interesting and curious aspect in terms because a few years ago, this would certainly have been attributed to the vaccinations because of the way things worked. In time, the vaccination immediately followed by fever, immediately followed by the seizure. It's very hard to say that there's no relationship, but if that was bound to happen anyway, somewhere in the six-month range that this infant is in. We are not saying that the genetic risk factor was not there, but it was not inevitable. It was not destiny that this child was going to have a seizure. We don't really know. It looks as if maybe it is. We know that in 35% of the cases of people that, first of all, SCM1A mutation is simply a genetic finding. It doesn't become Dravet's syndrome until you have a seizure disorder. We know that there are many children and many family members who have an SCM1A mutation and are perfectly normal. And that's why Dr. Raymond was wrong when he said it was the missense gene. Because when you have families, and for instance, some of the articles talk about extensive families where they all had the same mutation. Some of them had severe seizures, some had mild seizures, some had no seizures at all. And if you look at the last article that we provided in our reply brief, which should have been allowed in the case if we'd had a hearing, that case, that article perfectly demonstrates that timing is so important. If you don't have the first seizure until after 12 months, if you don't have any seizures for the first 12 months and you have the SCM1A mutation, you won't go on to have Dravet. Zero percent chance. If you survive six months, there's a 51% chance that you'll have a seizure. You're talking about conflicting evidence below. Where did you argue that the chief special master erred in relying on the government's evidence or that it was unreliable as opposed to that your expert was more persuasive? I mean, over and over again, you make these arguments, and they're very fascinating reading. But there's a counterargument to each one from the other side's experts. Well, and the other thing is that while she mentions the newer articles that have come out recently, the one article, of course, that hasn't been considered when we asked the court to take judicial notice is the one that we mentioned in our reply brief because that is a very significant article that came out just in 2017, which does point out significantly what we're talking about. How on earth can we? Well, this is the point that Your Honor was making is that medicine changes. It is no longer inevitable that someone who has an SCM1A mutation, a child, we have many children with SCM1A mutations that will never have Dravet's because they don't have anything to trigger the onset of seizures within the appropriate time frame. No, I was saying, yes, it changes, but the change hurts you. It does not hurt us. This is what the special master really said. Now that we know this relationship of this syndrome and these manifestations, they were so close to being inevitable that even if it was triggered by the fever or by the vaccination or whatever with a child with this genetic structure. This is like saying you have hemophilia. I didn't kill you when my car ran into you. If I hadn't done that, something else would have done it later. That's what exactly we have here. We know, for instance, this is a risk factor, but we also know that if those children don't have an exposure that triggers a seizure within the first six months, then their risk of developing Dravet's reduces to 51%. If they don't have something that triggers the first seizure within the year, they never have Dravet's syndrome. They go on to become adults who have the same SCM1A mutation and never have a problem. Let me back you up, please. Yes, sir. You asked us to take judicial notice of a 2017 article. What authority do you have, legal authority, that says that we can take judicial notice of a scientific article? As we pointed out in our brief, if we had been granted a hearing, a hearing would have been scheduled at the end of 2017. By that time, the article would have come out. We were denied a hearing. I've never had the opportunity to cross-examine these experts on this issue. When I talk, yes, please, or when Judge Newman talks, please. I asked you for what authority you have for us to take judicial notice. You're not answering that question. You're saying the hearing should have been held and then they would have done it. That doesn't allow us to take judicial notice of something. We can look and see what the weather was. That's judicial notice. If you look at the articles that were actually filed, the Claussen article makes it clear that there's something required other than SCN1 amputation in order to provoke Dravesian. You're not answering my question. About the judicial notice? About judicial notice. The only argument I have on that, Your Honor, is that if we had been granted a hearing, which we were denied, and I was denied the hearing, I didn't have the chance to cross-examine Dr. Raymond, I didn't have the chance to present the evidence of my witness. Don't waste your time. If that's your only argument. The Claussen article, for instance, talks about the fact that, and that's one of the articles that the government does rely upon, talks about the fact that when a seizure, and we know that seizures in 35% of the cases where seizures occur in SCN1A, a DPT vaccine occurred within 48 hours before that. So we know that DPT vaccines are a substantial trigger for Draves syndrome. That's highly significant. That's really high. The point we're making is that if this is avoided, and all these articles point out that the earlier the onset of Draves, the more severe it is and the more likely it is to, they looked at early-onset cases and late-onset cases. And so if we look at the Claussen articles, we look at Berkovich and McIntosh, all of these articles, which we described in our brief, point out the fact that if this child had not had this reaction, and everybody can agree that seizures were caused by that vaccine, the vaccine caused the seizure. The same day the child got a vaccination, 1130 that night, the child was seizing. No one's going to say that that vaccine wasn't the trigger for that seizure. What they're saying, though, is that this was inevitable. This child would have had seizures from Draves regardless of whether the child got the vaccine. That's not true. You cannot say that – I don't think they went that far. I think they said that with this propensity, this clear genetic propensity, even if the seizure was triggered by the vaccine, it was inevitable. No, if it's triggered by the vaccine, it's a but-for cause. But for the vaccine, the seizures would not have started that day. Do you agree with that? If you agree with that, then you have to go to the articles. And the articles say that the seizures, if you don't have the first thing that provokes a seizure within six months, you're reduced to 51%. This was six months. If that child had got past one year, the articles show that it would have been zero chance of the child developing Draves. The family article that you look at, if you look at the family article, the Goldberg-Stern article, which is on page 36 of our briefing, that article looked at families, an extensive family that took the history and they took the genetics of the whole family. They found that some had mild seizures, some had severe seizures, some didn't have any seizures at all. Some made it all the way through to adulthood with never having seizures. If this child had not had a seizure provoked by vaccine at the time he did, he may not have developed Draves. He may have made it to 12 months. Yes, something could have come along in the six months to 12 months that might have provoked the seizure. We don't know that. We don't have a crystal ball. That's not an alternate cause. You can't claim that as an alternate cause. If this child would have made it to 12 months without having a seizure, without having something that provoked the seizure, the child would have likely never had Draves syndrome, never had any seizure disorder. So this is not the sole cause, and it's not unrelated to vaccinations. We'll see. So let's hear from the Secretary. We'll ask the same questions. Mr. Principato. Good morning, and may it please the Court. My name is Daniel Principato, appearing on behalf of the Secretary of Health and Human Services. The issues today are whether the Chief Special Master's decision denying entitlement was arbitrary and capricious, and whether her decision to decide this case without an evidentiary hearing was an abuse of her discretion. You know, I don't think that even your side is taking the position that there was a 100% chance that there was no relation between the vaccination and the fever and the seizure, all happening within one day. That's correct. Within hours. That's correct. Isn't the position that you've taken is that this infant was going to have seizures anyway? And it does look as if that's quite a complicated position to take, on which a lot of information is still being learned. So why should this infant be on the short end of that? So our position is that the Chief Special Master's finding that the Drouvet Syndrome was not caused by the vaccine, was not arbitrary and capricious. So just to back up, it's well understood that vaccines can cause a fever that can lead to a seizure. But crucially here, the Chief Special Master concluded that the vaccine did not cause Drouvet Syndrome, and nor did the first seizure cause Drouvet Syndrome. So while a vaccine may cause a seizure, a vaccine is not going to cause an underlying seizure disorder. And the Chief Special Master evaluated all of the evidence, appropriately evaluated all of the evidence, and found that petitioners failed to meet their burden, and that the government, in fact, met its burden. What if the vaccine just merely triggers this genetic defect to manifest itself, whereas if this hadn't happened and the child got to be older, perhaps it could resist it? Well, there's no evidence that the vaccine can cause the genetic defect. No. Well, that's the problem, isn't it? And as a result, we've certainly seen enough cases where when the well is right, isn't it a table injury if there is a seizure within three days after vaccination? Well, this isn't a table case, and I'm not sure which claim you're referring to. But the question is whether the Chief Special Master was arbitrary and capricious in finding that the initial seizure didn't lead to the genetic defect. Let me walk you through a Daubert question. Okay. In de Bazin versus Secretary of Health and Human Services in 2008, the government made arguments similar to Oliver's Daubert arguments, and we rejected them, saying Daubert was inadequate because the Chief Special Master there didn't, or the Special Master, didn't exclude any expert evidence under Daubert. But in Terran v. Secretary, we affirmed the admission of Daubert information to find expert testimony unreliable rather than inadmissible. So does Daubert apply only when testimony is inadmissible, or does it apply to determining relative weight according to the testimony? Yeah, that's a great question. And in the vaccine program, it's been used to weigh credibility of evidence or reliability and persuasiveness of evidence, and not necessarily exclude it. And I think that that's probably due to the fact that the Vaccine Act has more admission evidentiary standards than regular courts. So if you're allowing Daubert to weigh evidence, did the Chief Special Master implicitly conduct a Daubert analysis? Well, I think so. I think that, yes, she evaluated the persuasiveness of the evidence in light of Daubert, and appropriately so. Which is what your opposing counsel should have said. That's where I was going. You know, if we didn't have the current capability of DNA analysis, and so an infant at six months gets the vaccination, within hours starts to run a high fever, within hours manifests seizures, the relationship cause and effect, I think, is not questioned that this is within the category of vaccine injury. What's happened here is that we've now found a complicating factor, a propensity, whatever you want to call it, but a genetic predisposition. I don't know if that's the right word, but anyway, a genetic flaw that has these manifestations, these seizures, epileptic-type seizures. But going back only a few years in the history of the vaccine injury legislation, there's no doubt, is there, but that this would have just been routinely included as compensable? Well, there is. I believe that science progresses. There is now. The Secretary's position is that a vaccine may cause a seizure, but it's not going to cause a seizure disorder. And it's not in the record, but even in epilepsy cases, I believe the science is now progressing to question whether that's a result of an underlying disorder that has yet to be identified. In this case, we have the specific identification of the underlying disorder, the SCN1A gene mutation. And so to establish a causation in fact claim under Althan, petitioners must show, in brief, a reliable medical theory showing that the vaccine can cause the condition, a logical sequence of cause and effect that the vaccine did cause the condition, and a proximate temporal relationship between the vaccination and the alleged condition. But even where the petitioner has stated a prima facie case under Althan, compensation must be denied where the government has shown by preponderance of the evidence that the condition was caused by factors unrelated to the administration of the vaccine. And so in this case, the chief special master found that petitioners failed to meet their burden under Althan, and even if they did, the secretary met his burden because it showed that EO's condition was caused by factors unrelated to the vaccination, the SCN1A gene mutation. And this court will review a special master's factual findings with a highly deferential, arbitrary, and capricious standard. And accordingly, this court will uphold a special master's decision so long as she has considered the relevant evidence, drew plausible inferences, and articulated a rational basis for her decision. Appellant's counsel today has attempted to reweigh much of the evidence. The question isn't whether this court would find in favor of EO or appellants today. The question is whether the chief special master's decision was arbitrary and capricious in denying entitlement. So moving to our second point, the Vaccine Act explicitly authorizes a special master to decide a claim without an evidentiary hearing. Similar entitlement claims have been filed in the past. At least 15 have been considered by special masters, five have reached this court, and compensation has been awarded in zero. The chief special master herself has decided three of these cases, Farrow v. HHS, Mathis v. HHS, and McCarran v. HHS. But nevertheless, petitioners were given a full and fair opportunity to litigate their claim. Petitioners were given an opportunity to file seven expert reports and over 80 scientific articles. The special master was within her discretion to determine a petitioner's claim based on the fact that the record was fully developed in light of the well-established background law. And moreover, petitioners were not stopped from litigating their case. Simply, no stop law doctrine was applied here. In sum, the chief special master's well-reasoned decision should be affirmed. Unless this court has any further questions, the government will rest on its brief. Thank you. I'd like to make the point that SCN1A mutation is not a single mutation. And there are many, many mutations in the sodium channel gene. So if you look at the actual findings in this particular case, what the lab says is since this type of sequence variants are similar to those observed in disease-associated mutations and benign polymorphisms, the nature of this variation precludes clear interpretation. Therefore, it is not possible to conclude with any reasonable degree of clinical certainty at this time whether or not this variant is associated with a phenotype in question. I saw that. But to my mind, I focused on the at-this-time aspect. And your Honor, you have to understand what I'm trying to say. And that is I agree with you wholeheartedly that medicine has changed. And remember what I said at the beginning is we've known forever that the reason why some kids react adversely to a vaccine while most do not has got to be due to genetic susceptibility. And now that we've discovered one, we've discovered, okay, this is a genetic susceptibility you have, now they're trying to say that's a sole factor unrelated to the vaccination? Impossible. It cannot be the sole factor unrelated to a vaccination. First of all, an SCM mutation is not an underlying disease. It's not an underlying seizure disorder. It's simply a genetic finding, period. And you don't have Dravet syndrome until you have seizure disorder. And the seizure disorder is triggered by something. If the baby had not had a vaccination. The baby might very well be alive and sitting here in this courtroom today, normal, with no problems, no Dravet or anything. If that child had made it to 12 months with nothing to trigger it, we can't speculate. We don't have a crystal ball to say that something might not have happened at nine months. Counsel? Yes. Let's hear from Judge Wallach. Sorry. If the baby had not had a vaccination, could the disease still have occurred? It could have. It could not have. Either way, we don't have a crystal ball. It's like saying I had a case one time where the expert on the other side, I said, he agreed that the vaccination probably triggered the seizure. He says, but it didn't have to be that. It could have been something else. It could have been an infection. It could have been a divorce of the parents. And I said, but those things didn't happen. What happened in this case was the vaccine. So, yes, are there other potential triggers of seizures and Dravet syndrome? Probably, because only 35% appear to be due to the vaccine. That's a huge percentage, incidentally. That's like a relative risk of 17, as we pointed out in our brief. The relative risk that if you have Dravet is that you had a vaccination within 48 hours before that is over 17. We normally think of relative risks in this program as being above two. Seventeen is huge. So we know that the DPT vaccination is a huge factor in triggering Dravet syndrome. It's not the only one. If the child didn't get these vaccines and didn't have that seizure that day of the vaccines, could something else have happened at nine months? Another vaccination, for instance, that might have triggered it? Yes. Could the child have gotten to 12 months and never had Dravet the rest of his life? Yes. And that's all pure speculation. That's not an alternate cause. This was clearly related to the vaccination. It was not the sole cause. The two things together are the cause. You have a genetic risk factor, a susceptibility. The vaccine triggers the onset of the seizure disorder. The two of them work together to cause it. We've known that forever. Now we're starting to identify some of the specific genes involved. And maybe someday, God willing, we'll be able to look at a child's profile and say, you shouldn't get this, that, or the other thing. That would be wonderful. Mr. Schimpp. I'm sorry. We have another question. I don't have a question. I have a comment. Yes, sir. We have to stick to the law in these cases. But they are so, in the true sense of the word, pathetic. There's so much pathos involved in every one of these. And I know you. I get infested. I'm sorry, Your Honor. But I understand. I just wanted to say that. Sorry. Can't help it. Thank you, sir. The case is taken into submission.